667 S.E.2d 7

SOUTH CAROLINA DEPARTMENT OF
TRANSPORTATION, Defendant,

v.

M & T ENTERPRISES OF MT. PLEASANT, LLC., Wells
Fargo Bank of Minnesota, N.A., Assignee, and
Walgreen Company, Lessee, Plaintiffs,

Of whom Walgreen Company is Appellant,

and

M & T Enterprises of Mt. Pleasant, LLC., is Respondent.

No. 4435.

Court of Appeals of South Carolina.

Heard April 10, 2008.
Decided Sept. 12, 2008.

646

648

Richard D. Bybee, of Mount Pleasant, for Appellant.

Randall S. Hiller, of Greenville, for Respondent.

PIEPER, J.:

This appeal involves a dispute between a landlord and tenant over the division of a compensation award from a partial taking of leased property by condemnation. Walgreen Company (Tenant) appeals the master-in-equity's decision to give the entire $100,000 award to M & T Enterprises of Mt. Pleasant, LLC (Landlord). Since we may affirm for any reason in the record, we affirm as modified.

## FACTS

In 2001, Tenant entered into a lease (Lease) with MD/CP–Mount Pleasant, LLC (MD/CP). The Lease clause titled "Delivery of Possession" provided Landlord would complete

construction of the building and deliver exclusive possession to Tenant in April 2002, or as soon thereafter as possible, but no later than January 2003. The Lease was for seventy-five years, but Tenant had the option of terminating it early at specified times. The leased premises specifically included "the [b]uilding, real estate and other improvements to be constructed thereon. . . ." In August 2004, Landlord was assigned MD/CP's interest under the Lease. Tenant was in possession of the property before the filing of a condemnation notice on October 29, 2004.

Article 4 (Condemnation Disclosure) in the Lease stated, "Landlord, after due inquiry, warrants and represents to Tenant that, other than the condemnation of a strip of land approximately five (5) feet wide along Hwy. 21, Landlord has no knowledge of any pending or threatened condemnation actions which will affect the Leased Premises." [1] The Lease also contained a site plan depicting an area labeled "20' Future R/W Per Town" abutting Highway 17. Additionally, the Lease contained a section on condemnation (Condemnation Clause), which was divided into two parts, 32(a) and 32(b). Section 32(a) of the Condemnation Clause provided in part:

If prior to Landlord's delivery of possession of the Leased Premises to Tenant in accordance with Article 4, any portion of the Leased Premises or the Driveway shall be taken by reason of condemnation or under eminent domain proceedings, or if as a result of such a condemnation, eminent domain proceeding or of modifications to adjacent public roadways, any curb-cut providing access to the Leased Premises will be closed, then Tenant may terminate this Lease at Tenant's option, to be exercised by notice to Landlord within sixty (60) days of such event, if in the opinion of Tenant, reasonably exercised, the remainder of the Leased Premises and/or access points thereto are or shall no longer be suitable for Tenant's business.

Section 32(b) provided in part:

If subsequent to Landlord's delivery of possession of the Leased Premises to Tenant in accordance with Article 4, a portion of the Leased Premises and/or the Driveway shall

---

1. The reference to Highway 21, rather than Highway 17, was apparently a clerical error.

be taken under eminent domain or by reason of condemnation and if in the opinion of Tenant, reasonably exercised, the remainder of the Leased Premises and/or Driveway is/are no longer suitable for Tenant's business, this Lease, at Tenant's option, to be exercised by notice to Landlord within sixty (60) days of such taking shall terminate; any unearned rents paid or credited in advance shall be refunded to Tenant. If this Lease is not so terminated, Landlord forthwith and with due diligence, shall restore the Leased Premises and/or Driveway to a proper and usable condition. Until so restored, fixed rent shall abate to the extent that Tenant shall not be able to conduct business, and thereafter, fixed rent for the remaining portion of the term shall be proportionately reduced.

Tenant shall be entitled to the award in connection with any condemnation insofar as the same represents compensation for or damage to Tenant's fixtures, equipment, nonpermanent leasehold improvements and other property of Tenant, moving expenses as well as the loss of leasehold estate (i.e. the unexpired balance of the lease term immediately prior to such taking); Landlord shall be entitled to the award insofar as same represents compensation for or damage to the fee remainder (including damage to the Building structure, and other permanent leasehold improvements made at the expense of Landlord under Article 5 hereof).

On October 29, 2004, the South Carolina Department of Transportation (SCDOT) filed a condemnation notice. The notice involved a strip of land along Highway 17 varying in width from one to fourteen feet for a length of approximately three hundred feet, totaling 4,245 square feet of land. Prior to the condemnation, the leased premises encompassed 100,-493 square feet or 2.31 acres. Tenant did not terminate the Lease after the taking and continued paying $31,083.33 in monthly rent as provided by the Lease. Tenant, Landlord, and SCDOT agreed to a condemnation award of $100,000. Tenant and Landlord did not agree on the division of the award, and their dispute was referred to the master-in-equity.[2]

---

2. The order of reference specifically directed the master-in-equity to "determine the proportional share the Landowner and Tenant should receive" from the condemnation award. No other issues were referred to the master-in-equity.

At the hearing before the master-in-equity, Tenant's expert witness testified that Tenant was entitled to a rent reduction of $491.07 per month under the Condemnation Clause.[3] First, the expert used the 2004 report generated by SCDOT's appraiser as a baseline to determine the fair market value of the property itself (not the leasehold) before and after the taking; he concurred with both the difference in value to the property in fee and the acreage differential caused by the taking. Using the income approach, he then appraised Tenant's interest in the award at $81,400, resulting from the reduction in rent over the life of the Lease. The expert witness arrived at this figure by determining the land in the Lease was 37.4% of the total value of the property. He determined the taken land was 4.22% of the total land. Next, because the taking only involved land and not the building, the expert determined that it represented 1.58% of the total value of the property. Accordingly, 1.58% of the monthly rent Tenant paid of $31,083.33 amounted to $491.07 per month. The expert then calculated the present value of the monthly reduction over the life of the lease and determined the value as either $91,200 or $81,400, depending upon the capitalization rate he applied. The expert ultimately selected the $81,400 value.

The master-in-equity relied upon the contract between the parties and found that Tenant "has offered absolutely no evidence that the leasehold estate today is worth less than the leasehold estate that it held" on the date the Lease was either executed or delivered. The master-in-equity further stated that Tenant is "only entitled to the difference between what they pay in rent and what the property could be leased for." As additional sustaining grounds, the master-in-equity found: (1) that the leased premises "excluded the first 20–feet of the subject premises as a future right of way and within which the condemnation actually occurred"; and (2) that, for purposes of the Lease, the condemnation action commenced when Landlord notified Tenant of the threatened condemnation in Article 4 of the Lease, which occurred prior to Tenant's possession. Thus, the only alternative under the terms of the Lease would have been to terminate the Lease. Since the master-in-equity determined that Tenant did not prove damages to the lease-

---

3. Tenant's expert was the only witness to give testimony.

hold interest, he awarded the full $100,000 to Landlord. This appeal followed.

## ISSUES

Tenant raises the following issues on appeal:

I. Whether the trial court erred in applying the common law standard to measure a tenant's portion of a condemnation award instead of applying the condemnation provisions of the lease;

II. Whether the trial court erred in ignoring the terms of a rent reduction condemnation clause in a condemnation allocation proceeding;

III. Whether a condemnation clause is controlling between a tenant and its landlord in an allocation dispute under the South Carolina Eminent Domain Procedures Act;

IV. Whether the trial court erred in determining that a clause giving notice of a possible condemnation affected Tenant's possible right to a proportionate rent reduction under the lease's condemnation clause;

V. Whether the trial court erred in holding, as a matter of law, that the lease excluded an area described as a future right of way;

VI. Whether the trial court erred in holding, as a matter of law, that Tenant's only remedy in the event of a partial condemnation was termination of the lease;

VII. Whether the trial court erred in finding that the condemnation action commenced prior to Tenant's possession of the property; and

VIII. Whether award of the entire amount of the condemnation settlement to landlord M & T is inequitable?

## STANDARD OF REVIEW

■ A proceeding to allocate any condemnation funds is by statute a proceeding in equity. S.C.Code Ann. § 28–2–460 (2007). In an equitable proceeding, we may find facts in accordance with our own view of the preponderance of the evidence. *See Murrells Inlet Corp. v. Ward,* 378 S.C. 225, 231, 662 S.E.2d 452, 455 (Ct.App.2008); *see also Friarsgate, Inc. v.*

*First Fed. Sav. & Loan Ass'n of South Carolina,* 317 S.C. 452, 456, 454 S.E.2d 901, 904 (Ct.App.1995). However, our broad scope of review does not require this court to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Sloan v. Greenville County,* 356 S.C. 531, 546, 590 S.E.2d 338, 346 (Ct.App.2003).

Moreover, a case with both legal and equitable issues presents a divided scope of review. Thus, "a legal question in an equity case receives review as in law." *Sloan v. Greenville County,* 356 S.C. 531, 546, 590 S.E.2d 338, 346 (Ct.App.2003) (citing *Gunter v. Fallaw,* 78 S.C. 457, 59 S.E. 70 (1907)). Questions of law may be decided with no particular deference to the trial court. *Doe ex rel. Legal Guardian v. Barnwell School Dist. 45,* 369 S.C. 659, 662, 633 S.E.2d 518, 519 (Ct.App. 2006) (citing *Moriarty v. Garden Sanctuary Church of God,* 341 S.C. 320, 327, 534 S.E.2d 672, 675 (2000)). This court may correct errors of law in both legal and equity actions. *I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 411, 526 S.E.2d 716, 719 (2000) (citing S.C.Code Ann. § 14–8–200 (Supp.1998)).

## LAW/ANALYSIS

Tenant contends that this case is one of contract interpretation and that the contractual agreement controls the allocation of the condemnation award.[1] As such, Tenant claims that the Lease provides two remedies in the event of condemnation of the leased premises: (1) to have its rent proportionately reduced for the remaining portion of the lease term; and (2) to share in the condemnation award to the extent of any loss of its leasehold estate.

Lease provisions are construed under rules of contract interpretation. *See United Dominion Realty Trust, Inc.*

---

4. We recognize the condemnation statute indicates that any funds be held pending final order of the court of common pleas in an equity proceeding. S.C.Code § 28–2–460 (2007). However, the case was presented to the master-in-equity as one of contract interpretation. Although the issues raised by Tenant at trial were of a contractual nature, our consideration of the legal question presented as to the law governing the valuation of a partial taking would be the same under a legal or equitable standard of review.

*v. Wal–Mart Stores, Inc.,* 307 S.C. 102, 105–07, 413 S.E.2d 866, 868–69 (Ct.App.1992) (applying the rules of contract construction to interpret the lease of a shopping center). One cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties. *Chan v. Thompson,* 302 S.C. 285, 289, 395 S.E.2d 731, 734 (Ct.App.1990). To determine the intention of the parties, the court "must first look at the language of the contract." *C.A.N. Enters., Inc. v. South Carolina Health and Human Servs. Fin. Comm'n,* 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). The construction of a clear and unambiguous contract presents a question of law for the court. *Ward v. West Oil Co., Inc.,* 379 S.C. 225, 665 S.E.2d 618 (Ct.App.2008); *see also Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n,* 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001).

▆▆▆▆ It is also a question of law whether the language of a contract is ambiguous. *South Carolina Dep't of Natural Res. v. Town of McClellanville,* 345 S.C. 617, 623, 550 S.E.2d 299, 302–03 (2001). When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary, and popular sense. *C.A.N. Enters., Inc.,* 296 S.C. at 377, 373 S.E.2d at 586. Where an agreement is clear and capable of legal construction, the court's only function is to interpret its lawful meaning and the intention of the parties as found within the agreement and give effect to it. *Ebert v. Ebert,* 320 S.C. 331, 338, 465 S.E.2d 121, 125 (Ct.App.1995). We are without authority to alter an unambiguous contract by construction or to make new contracts for the parties. *C.A.N. Enters., Inc.,* 296 S.C. at 378, 373 S.E.2d at 587. A court must enforce an unambiguous contract according to its terms regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully. *Lindsay v. Lindsay,* 328 S.C. 329, 340, 491 S.E.2d 583, 589 (Ct.App.1997). Tenant concedes in its reply brief that the Lease is not ambiguous.

## I. Rent Abatement

Tenant argues in several of its issues on appeal that the master-in-equity ignored the terms of the Lease's Condemna-

tion Clause calling for rent reduction in a condemnation allocation proceeding (addressing issues I–III). We disagree.

As noted, the Lease's Condemnation Clause under Article 32 is divided into two sections, 32(a) and 32(b). Article 32(a) applies only when all or part of the leased premises is taken by condemnation prior to the tenant's possession. Contrary to the trial court's findings, this event occurred after Tenant took possession of the property.[5] Thus, according to its terms, Article 32(a) does not apply here.

Article 32(b) of the Lease addresses the rights and duties of the parties if part or all of the leased premises is taken subsequent to Tenant's possession. Because we view the condemnation to have occurred after Tenant took possession of the property, we find this article applicable.

Article 32(b) is subdivided into two distinct paragraphs. The first applies in the event of a partial or total taking by condemnation: Tenant may either (1) terminate the Lease; or (2) if not terminated, may claim restoration of the leased premises by Landlord. An entitlement to rent abatement and a proportional reduction in rent is separate and distinct from the subject of the second paragraph, which is the allocation of any portion of the condemnation award under the Lease.

As our supreme court has indicated, "[w]hen a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense." *C.A.N. Enters., Inc.*, 296 S.C. at 377, 373 S.E.2d at 586. Moreover, leases are construed in the same manner as contracts:

> The terms of a lease, like the terms of any contract, are construed to achieve the intent of the parties at the time the

---

5. Tenant contends the master-in-equity erred in his alternative finding that the condemnation action commenced prior to its possession of the property, thereby leaving Tenant with the sole remedy of terminating the Lease (addressing issues VI and VII). We agree. Both articles in the Lease's Condemnation Clause are triggered by an actual taking by condemnation or eminent domain. Thus, by written agreement of the parties to the contract, the Landlord and Tenant had already decided that the date upon which the land was "taken," in part or whole, would govern. Accordingly, by the terms of the Lease, the condemnation action commenced at the time SCDOT filed the Condemnation Notice.

lease was entered into. The courts must construe and enforce contracts as written, in order to preserve the fundamental right of freedom of contract. In general, therefore, parties may bind themselves as they see fit by contract, unless the contract would violate the law or is contrary to public policy.

*Lexington Ins. Co. v. Tires Into Recycled Energy and Supplies, Inc.,* 136 N.C.App. 223, 522 S.E.2d 798, 800 (1999) (internal citations omitted). As such, it is generally held that parties may agree in the lease to a method or formula of valuation or compensation in the event of condemnation. *See City and County of Honolulu v. Mkt. Place, Ltd.,* 55 Haw. 226, 517 P.2d 7, 15 (1973) ("Where a landlord and tenant have contractually agreed as to the disposition of compensation in the event of condemnation, such an agreement is generally held binding."); *City of Manhattan v. Galbraith,* 24 Kan. App.2d 327, 945 P.2d 10, 12–13 (1997) ("[I]f the lease itself includes a provision in respect of the rights of the parties in the event of the condemnation of the leased premises, such provision is controlling, if applicable to the particular case.") (citations omitted); *City of Kansas City v. Manfield,* 926 S.W.2d 51, 53–54 (Mo.Ct.App.1996) ("[S]pecific provisions in a lease spelling out the respective rights of the parties to that lease are valid and controlling in the event the property is condemned. Such lease provisions have uniformly been upheld.") (citations omitted).

 Here, according to the Lease's clear, explicit and unambiguous language, no right to an abatement of rent out of the condemnation award exists. Moreover, under these circumstances, whether Tenant is entitled to an abatement of rent is an issue beyond the limited scope of the matter referred to the master-in-equity; his sole duty was to determine the proportional share the landowner (Landlord) and Tenant should receive from the condemnation award. *Bunkum v. Manor Props.,* 321 S.C. 95, 98, 467 S.E.2d 758, 760 (Ct.App.1996) ("Pursuant to Rule 53, SCRCP, a master has no power or authority except that which is given to him by the order of reference.") (citing *Smith v. Ocean Lakes Family Campground,* 315 S.C. 379, 381, 433 S.E.2d 909, 910 (Ct.App. 1993)). Any entitlement to rent abatement would be the subject of a separate contract action between Landlord and

Tenant and is beyond the scope of the order of reference. Accordingly, we agree the award should not be allocated to Tenant on the basis of contractual rent abatement.[6]

## II. Preservation of Grounds of Appeal Other Than Alternative Findings

Having disposed of the rent abatement argument, we next question whether Tenant has preserved any other grounds of appeal relating to the condemnation award beyond asserting that the terms of the contract should govern apportionment of the award rather than the common law rule, and beyond the challenge to the alternative findings. A reading of Tenant's briefs to this court suggests the gravamen of Tenant's position is that the contractual provisions of the Lease control and that Tenant is entitled to rent abatement.

It is well settled that an issue must have been raised to and ruled upon by the trial court to be preserved for appellate review. *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000). Additionally, "[i]f the losing party has raised an issue in the lower court, but the court fails to rule upon it, the party must file a motion to alter or amend the judgment in order to preserve the issue for appellate review." *Elam v. South Carolina Dep't of Transp.*, 361 S.C. 9, 24 n. 4, 602 S.E.2d 772, 780 n. 4 (2004). Without an initial ruling by the trial court, a reviewing court simply would

---

6. Tenant also argues the master-in-equity erred in his alternative finding that the Condemnation Disclosure in the Lease acted to exclude the area taken by condemnation from the leased premises, and thus from the terms of the Condemnation Clause (addressing issues IV and V). We agree. Under the terms of the Lease, the leased premises for which Tenant paid rent included the twenty foot right-of-way area, within which the taking by condemnation occurred. The description of leased premises included all 100,493 square feet of real estate on the plot. While a twenty foot future right-of-way was indicated in both an exhibit attached to the document, as well as the Condemnation Disclosure, the area was still included within the total amount of property leased. Additionally, the area actually taken was less than that demarcated on the site plan. Thus, the unambiguous language of the Lease shows that the parties did not intend for the twenty foot right of way area, from which a portion was condemned, to be excluded from the leased premises or exempt from the Condemnation Clause. Accordingly, the master-in-equity erred in determining the Condemnation Clause did not apply to the area of condemned property. Since this was an alternative ruling by the master-in-equity, it does not affect our disposition herein.

not be able to evaluate whether the trial court committed error. *Staubes*, 339 S.C. at 412, 529 S.E.2d at 546. Furthermore, even if an issue is preserved at the trial court level, it must still be properly raised and argued to the appellate court. *See Fields v. Fields*, 342 S.C. 182, 191, 536 S.E.2d 684, 689 (Ct.App.2000) (stating "issues not argued in the brief are deemed abandoned and will not be considered on appeal.") (citing *First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994)); *See also Glasscock, Inc. v. U.S. Fid. and Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct.App. 2001) (stating "a one sentence paragraph raised in an appellants brief was insufficient to preserve the argument for review.").

■ Tenant asserted that *Hamilton v. Martin*, 270 S.C. 223, 225, 241 S.E.2d 569, 570 (1978) does not apply where a contract contains a condemnation clause and that *Hamilton* was a total taking case, but only raised this argument in the context of its contract analysis. Notwithstanding, Tenant agreed in its brief that where the terms of a lease are silent pertaining to the method of allocation, the common law is controlling. Since the master-in-equity did not address whether Hamilton was the appropriate common law method of valuation governing a partial taking instead of a total taking, Tenant had an obligation to preserve the issue pursuant to Rule 59(e), SCRCP. Elam, 361 S.C. at 24 n. 4, 602 S.E.2d at 780 n. 4. Moreover, although Tenant arguably made this assertion before the master-in-equity, it has now been abandoned on appeal as it has not been argued outside the applicability of the Lease.

Tenant's remaining grounds on appeal address either the master-in-equity's alternative findings or the alleged inequity of the allocation decision. Since we have addressed the alternative findings, and since we find the equity argument not preserved,[7] we conclude Tenant is not entitled to a portion of

---

7. Tenant asserts the master-in-equity erred in allocating the entire condemnation award to Landlord since that award is inequitable (addressing issue VIII). We find this issue not preserved for review. The master-in-equity applied a contract analysis to the case, not an equity analysis. However, although arguably raised in its proposed order submitted in lieu of a brief to the trial court, Tenant never filed a motion under Rule 59, SCRCP, asking the court to address the issue.

the condemnation award based upon contractual rent abatement; any entitlement to rent abatement would be the subject of a separate contract action as previously indicated.

## III. Leasehold Valuations for Total Takings and Partial Takings

While our preservation concerns are significant, we recognize, at a minimum, Tenant argued that the Lease controlled, not *Hamilton*, and we note that the Lease indicates Tenant was entitled to a portion of the condemnation award for "loss of leasehold." We also recognize the statutory mandate in the condemnation context to engage in an equitable analysis of the apportionment of a condemnation award. As such, we analyze, for equitable and fairness purposes, Tenant's colorable assertion that the master-in-equity improperly relied upon the *Hamilton* method; pursuant to our equitable review under the statute, we nonetheless would affirm since we may do so for any reason in the record, whether or not raised and preserved.

Paragraph two under Article 32(b) directly addresses allocation of a condemnation award between the parties as compensation for expressly defined categories of damages. Tenant argues on appeal that this paragraph entitles it to compensation for any loss of its leasehold estate and that the master-in-equity erred in denying a portion of the award.

Specifically, the award allocation paragraph states:

Tenant shall be entitled to the award in connection with any condemnation insofar as the same represents compensation for or damage to Tenant's fixtures, equipment, nonpermanent leasehold improvements and other property of Tenant, moving expenses as well as the loss of leasehold estate (i.e. the unexpired balance of the lease term immediately prior to such taking). Landlord shall be entitled to

*Elam*, 361 S.C. at 24 n. 4, 602 S.E.2d at 780 n. 4. While we recognize the statutory mandate to determine the issue of allocation in an equitable proceeding, the master-in-equity was never asked to address that equitable apportionment argument after issuance of his order; moreover, it would not change our result because the same law of partial taking would apply in both a legal and equitable proceeding. Notwithstanding, we note the basis of Tenant's argument at trial was that the provisions of the Lease controlled the disposition of the proceeds, not the statute. Therefore, we find no prejudice.

the award insofar as same represents compensation for or damage to the fee remainder . . . .

This section delineates the manner in which any condemnation award shall be allocated.

As indicated, the Lease specifically provides the items for which Tenant is to be compensated in the event of condemnation. Tenant asserts a "loss of leasehold estate" entitles it to a portion of the condemnation award. Because the manner in which "loss of leasehold estate" is calculated is not delineated by the Lease, the master-in-equity relied upon what he considered to be the common law standard for valuing a leasehold estate when considering the allocation of the condemnation award. *See Farr v. Williams*, 232 S.C. 208, 212, 101 S.E.2d 483, 485 (1957) (finding when a lease contains no provision as to the effect upon it of condemnation, the court looks to the common law rule).[8]

As previously noted, the master-in-equity here applied the same method of valuing a leasehold estate as used in *Hamilton*. In that case, there was a conflict between a landlord and tenant over the allocation of an award from the condemnation of leased premises. *Hamilton*, 270 S.C. at 225, 241 S.E.2d at 570. The master-in-equity there measured the leasehold estate as "the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew the lease, less the agreed rent which the tenant would pay for such use and occupancy." *Id.* In short, the leasehold value in a total condemnation is the difference between the market value rent and the rent paid by the tenant over the full course of the lease including renewal options. However, it is important to note that the South Carolina Supreme Court merely relied upon the unappealed *Hamilton* formula as the law of that case procedurally, not as the law of

---

8. The applicable Lease provision and parenthetical indicates as follows: "the loss of leasehold estate (i.e. the unexpired balance of the lease term immediately prior to such taking)." Neither of the parties at trial or on appeal have argued that this parenthetical language indicates the parties clearly intended to limit the meaning of "loss of leasehold" to a total taking situation by referencing the unexpired balance of the lease term prior to the taking. The term "i.e." is a common abbreviation meaning "that is." *Black's Law Dictionary* 762 (8th ed.2004). Since the parties failed to argue this issue, we do not consider it on appeal.

this state governing all leasehold estate valuations.[9] *Id.* Moreover, the taking was total in Hamilton, not partial, as in the case at bar. *Id.*

The Hamilton formula was later cited in *Gray v. South Carolina Department of Highways and Public Transportation,* which was an inverse condemnation case. 311 S.C. 144, 153, 427 S.E.2d 899, 904 (Ct.App.1992) (rejecting the capitalization of business earnings method as not conforming with the *Hamilton* formula for valuation of a leasehold estate) *overruled by, Hardin v. South Carolina Dep't of Transp.,* 371 S.C. 598, 607–08, 641 S.E.2d 437, 442–44 (2007). In *Gray,* this court utilized *Hamilton* as a valid method for measuring the value of a leasehold interest in a case where "there was no physical taking of a portion of property in which [sublessee] had a leasehold interest," but where the "property was no longer valuable as a service station after the [abutting] intersection was closed." *Gray,* 311 S.C. at 153–54, 427 S.E.2d at 904. In short, this court applied the Hamilton formula to measure a leasehold interest where the damages (special injuries) from the closing of an intersection *effectively* resulted in a total taking of the sublessee's leasehold (it closed its business).[10] *Id.*

The formula used in *Hamilton* is widely recognized as the proper method to measure a leasehold estate when the leased premises are deemed entirely condemned and taken. *See, e.g., U.S. v. Petty Motor Co.,* 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) ("The measure of damages is the difference between the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew in the lease ..., less the agreed rent which the tenant would pay for such use and occupancy."); *Pepsi–Cola Metro. Bottling Co., Inc. v. Romley,* 118 Ariz. 565, 578 P.2d 994, 1001 (Ariz.Ct.App.1978) (holding the "proper measure of

---

9. Since no appeal was taken from the formula used by the master-in-equity and circuit court, the supreme court did not disturb the method applied in *Hamilton. Id.* 270 S.C. at 225–26, 241 S.E.2d at 570–71.

10. The South Carolina Supreme Court overruled the "special injury" analysis used in *Gray* and similar cases, holding "that our focus in these cases is on how any road re-configuration affects a property owner's easements. An easement is either taken or it is not." *Hardin,* 371 S.C. at 609, 641 S.E.2d at 443.

that value is the difference between the market value of the unexpired term of the lease over and above the rent stipulated to be paid to the lessor under the lease, reduced to present value."); *Ellis v. Dep't of Transp.*, 175 Ga.App. 123, 333 S.E.2d 6, 7 (1985) (measuring loss of leasehold as "diminution in the market value of the leasehold during the remainder of the unexpired term of the lease, less any rents to be paid by the lessee."); *Dep't of Public Works and Bldgs. v. Blackberry Union Cemetery*, 32 Ill.App.3d 62, 335 N.E.2d 577, 580 (1975) (stating proper award to lessee for total condemnation is "the fair rental value of the leasehold interest minus the actual rent paid. The difference or the advantage lessee enjoys by paying less rent than others would pay, is the amount lessee should be awarded for his loss."); *New Jersey Highway Auth. v. J. & F. Holding Co.*, 40 N.J.Super. 309, 123 A.2d 25, 29 (1956) ("The burden descends upon the tenant to disclose by a fair preponderance of the evidence that the fair market value of his lease was greater than the rent reserved."); *Texas Fruit Palace, Inc. v. City of Palestine*, 842 S.W.2d 319, 323 (Tex. App.1992) (holding the "measure of value of a leasehold estate is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, less the agreed rent; the values are determined by the usual willing buyer, willing seller rule."); *Exxon Corp. v. M & Q Holding Corp.*, 221 Va. 274, 269 S.E.2d 371, 376–77 (1980).

 Therefore, in a total taking, the tenant is usually entitled to the lease advantage, or "bonus value." Simply stated, the "bonus value" is "the difference between the economic rental, which is the fair market value of the leasehold interest, and the contract rental, which is the actual rent paid according to the terms of the lease agreement, discounted to present value." *City of Riverside v. Progressive Inv. Club of Kan. City, Inc.*, 45 S.W.3d 905, 911 (Mo.Ct.App.2001).

A different method of valuation is commonly used where, as here, only a partial taking by condemnation of the leased premises occurs. This particular issue has not yet been addressed by the South Carolina Supreme Court. While there is a split of authority on the matter, the general rule in other jurisdictions is that, "where only a portion of the leasehold is condemned, the measure of damages is the difference between the fair market value of the lease before and after the

taking." *Mobil Oil Corp. v. Phoenix Cent. Christian Church,*
138 Ariz. 397, 675 P.2d 284, 287–88 (1983) (holding also that
this measure of damages "will accurately reflect the lessee's
damages even if there was no before condemnation bonus
value" in the leasehold estate); *accord Batcheller v. Iowa
State Highway Comm'n,* 251 Iowa 364, 101 N.W.2d 30, 33
(Iowa 1960) (holding the proper measure of damages as "the
value of the use of the premises before the appropriation less
what it is worth afterwards."); *Veirs v. State Roads Comm'n,*
217 Md. 545, 143 A.2d 613, 616 (1958) (stating that where the
"evidence in the record extract is not sufficient to show a
complete taking of the leasehold interest.... The measure of
damages to the lessee would, therefore, seem to be the
difference in market value of the lessee's interest before and
after the taking."); *Kafka v. Davidson,* 135 Minn. 389, 160
N.W. 1021, 1023 (1917); *In re Com., Dep't of Transp.,* 67
Pa.Cmwlth. 318, 447 A.2d 342, 345 (1982) (holding the proper
measure of damages as the "difference between the fair
market value of its leasehold interest immediately before the
partial taking and the fair market value of the leasehold
interest remaining immediately after the taking, projected
over the remaining term of its lease and discounted to its
present worth," and that "the fair market value of the lease is
the amount a willing and fully informed buyer would pay for
the leasehold interest, and the sum for which a willing and
fully informed seller would sell the leasehold interest."); *see
also* Annotation, *Eminent Domain: measure and elements of
lessee's compensation for condemnor's taking or damaging of
leasehold,* 17 A.L.R.4th 337, 372 § 5 (1982).

The fundamental rationale driving this view is two-fold.
First, "it has generally been held that that which is taken or
damaged is the group of rights which the so-called owner
exercises in his dominion of the physical thing...." *U.S. v.
General Motors Corp.,* 323 U.S. 373, 380, 65 S.Ct. 357, 89
L.Ed. 311 (1945). Additionally, "[t]he right to occupy, for a
day, a month, a year, or a series of years, in and of itself and
without reference to the actual use, needs, or collateral ar-
rangements of the occupier, has a value." *Id.* Thus, a lessee,
as temporary holder of these rights upon the leased premises,
possesses a thing of value which must be compensated if taken
unless the parties agreed otherwise. Second, if the lessee was

paying exactly the fair market value of the leasehold prior to the partial condemnation, then there is no bonus value; as such, "if the condemnation reduces the value of the leasehold while the lessee is still required to pay the same amount of monthly rent, damages result to the extent that the lessee now pays a rent greater than the fair market value of the property." *Mobil Oil Corp.*, 675 P.2d at 288. Under such circumstances, it is this value for which the lessee is normally compensated in a partial taking situation. In its simplest form, "the measure of damages of a tenant is the market value of what is lost." *Id.*

Therefore, even though Tenant did not actually occupy or use the strip of condemned property in the case at bar, it still paid rent for the total leased premises, which included the condemned area, and had dominion over it until taken. Furthermore, Tenant continues to pay the same monthly rent now as it did before the taking. Consequently, absent an agreement otherwise, Tenant normally would be compensated in accordance with the general common law rule for a partial taking upon proof of such damage, which is the difference between the fair market value of the lease before the taking, and the fair market value of the lease after the taking, projected over the remaining term of its lease and discounted to its present worth.

As to damages, "the burden is on a party pleading a fact to prove it." *LandBank Fund VII, LLC. v. Dickerson,* 369 S.C. 621, 628, 632 S.E.2d 882, 886 (quoting *Jackson v. Frier,* 146 S.C. 322, 329, 144 S.E. 66, 68 (1928)) (internal quotation marks omitted). This general principle of litigation has been applied to disputes concerning apportionment of condemnation awards in other jurisdictions, and we apply it here as well. *See, e.g., Mobil Oil Corp.,* 675 P.2d at 286 ("The owner of the leasehold estate bears the burden of establishing the damages sustained to its leasehold estate as a result of the partial taking of the land."); *Santa Fe Trail Neighborhood Redev. Corp. v. Coehn & Co.,* 154 S.W.3d 432, 444 (Mo.Ct.App. 2005) (stating the lessee has the burden to show any damages attributable to the loss of leasehold interest, and the balance of damages, if any, belong to the reversionary interest of landowners); *J. & F. Holding Co.,* 123 A.2d at 29; *State ex rel. State Highway Comm'n v. Sherman,* 82 N.M. 316, 481

P.2d 104 (1971) (holding that, during the apportionment trial, "[t]he burden was on [lessee] to establish her damages."); *City of Sioux Falls v. Naused*, 88 S.D. 303, 218 N.W.2d 536, 539 (1974) ("Proof of tenancy in the condemned premises is not necessarily proof of compensable loss."); *Colley v. Carleton*, 571 S.W.2d 572, 574 (Tex.App.1978) ("[T]he lessee has the burden to show the amount of the damages attributable to his leasehold interest, if any. . . . The balance of the damages, if any, would belong to the reversionary interest of the landowners.").

The imposition of the burden of proof upon the lessee merely reflects the significant property interest of the landowner as fee simple owner, and recognizes that what is not proven as damages by a tenant belongs, or reverts, to the owner. Because of the strong policy of our State in favor of the ownership rights of the landowner, a rule allocating the burden of proof to a tenant not only is consistent with this policy, but also is fair since the landowner has permanently lost part of the property and would otherwise be entitled to the award. Moreover, the burden imposed upon a tenant to prove damages remains the same whether the allocation proceeding is in equity or law.

Here, the master-in-equity utilized an improper method of valuation for a partial taking. However, the record does not include all of the essential components of the appropriate valuation process in a partial taking situation. In estimating the economic rent, Tenant's expert stated the gross potential income was $373,000 per year. The expert calculated Tenant's damages using two alternative approaches, one using a 6.4 capitalization rate ($91,200) and the other using a 7.2 percent capitalization rate ($81,400).[11] On direct examination, he also

---

11. We note the existence of criticism of the capitalization method as a basis for apportioning an award between a lessor and lessee, since there is not necessarily a relationship between the loss a lessee suffered and the amount of any allocation received. "The capitalization approach is generally based upon the capitalization of the rental income of the property." *Mobil Oil Corp.*, 675 P.2d at 287 n. 2. "The sum of the values of the leasehold and the reversion, as independently determined, is often less than the market value of a fee simple estate in the land." Application of the capitalization approach in such cases confers a windfall upon the lessee, who receives the balance of the award after computation of the value of the lessor's interest. Conversely, where the

agreed that $81,400 represented the fair market value loss to the value of Tenant's leasehold estate; however, this figure was solely and improperly based upon the original gross potential rental income prior to condemnation, not on the difference between the fair market value of the leasehold before and after the taking. The expert utilized a percentage based upon the land taken and applied it in part to the starting figure of economic rent. Thus, the expert's calculation for the loss to Tenant was individually based on the initial economic rent analysis and was not representative of the difference in the fair market values, i.e. the difference between what a willing and fully informed buyer would pay for the leasehold interest and the sum for which a willing and fully informed seller would sell the leasehold interest before and after the taking. The determination of this difference in fair market value is critical to a partial taking analysis because the damages suffered to a leasehold interest after a partial condemnation may not bear a direct correlation to the percent of the area condemned. *See Great Atl. & Pac. Tea Co. v. State,* 22 N.Y.2d 75, 291 N.Y.S.2d 299, 238 N.E.2d 705, 711 (1968) (holding the trial court's computation and award of lessee's damages linked directly to the percentage of property taken was in error). While there was evidence of the fair market value of the property in fee itself before and after the taking, the fair market value of the *leasehold after* the taking does not appear in the record. In support of our conclusion, Tenant even acknowledges in its brief that the expert "did not offer an opinion of what the rental value of the entire property was worth in the after condition."

While we agree the master-in-equity erred in applying a total taking analysis as opposed to a partial taking analysis, we find no prejudice since the appellant failed to develop the record as to an essential component of the partial taking analysis. Similarly, if the supreme court were to adopt

---

aggregate value of leasehold and reversion exceeds the value of a fee simple estate, one of the condemnees will be undercompensated. *Id.* at 287. Thus, "[i]t is neither a measure of the damages suffered by the lessee nor an approximation of the market value of the lease." *Id.* at 288 (quoting Boyer and Wilcox, *An Economic Appraisal of Leasehold Valuation in Condemnation Proceedings,* 17 U.Miami L.Rev. 245, 273 (1963)).

a method of valuation based on any "bonus value" in the lease akin to that reflected by the *Hamilton* method, the record fails to establish the "bonus value" claimed in this case. Significantly, the expert admitted on cross examination that as of the date of his appraisal, the actual rent was the same as the gross income of the Lease. In short, no "bonus value" was shown by Tenant prior to arriving at its stated damages to such an interest.[12] Thus, Tenant would not prevail even under a "bonus value" theory based upon this record.

Therefore, we need not decide with finality which method the supreme court would adopt because under either method, the record supports the determination by the master-in-equity that Tenant failed to meet its burden of proof. Accordingly, we find no prejudice and no reversible error. *See Upchurch v. New York Times*, 314 S.C. 531, 538, 431 S.E.2d 558, 562 (1993) ("We may affirm the trial judge for any reason appearing in the record.") (citing Rule 220(c), SCACR).

The dissent contends we have reached beyond a preserved issue in our discussion of the proper method of valuation, yet also contends the statutory mandate of an equitable allocation proceeding need not be raised and preserved in light of our scope of review. Tenant clearly and consistently asserted to the trial court and in its briefs to this court that the contract controlled this dispute. Only on appeal, after arguing at trial that only the contract controls the entire dispute, does the Tenant ask this court to find the decision inequitable. Thus, our preservation concern is not addressed to our standard of review; rather, our preservation concern focuses solely on the arguments Tenant presented to the trial court. If Tenant contends it had properly asserted to the trial court that the

12. We further note that, while certainly not controlling, the master-in-equity as trier of fact was free to accept or reject any or all of a witness's testimony, including that of an expert witness. *See Dixon v. Besco Eng'g, Inc.*, 320 S.C. 174, 181, 463 S.E.2d 636, 640 (Ct.App.1995) ("The fact finder must determine the weight to be accorded the testimony of the witnesses, and accept or reject their valuations."); *see also Bray v. Head*, 311 S.C. 490, 497–98, 429 S.E.2d 842, 846 (Ct.App.1993) (upholding the special master's decision to decline defendant's expert testimony, even though opposing party did not offer expert testimony); *Miller on Behalf of Grand Strand Diversified, Inc. v. Gandee*, 285 S.C. 174, 178, 328 S.E.2d 482, 484 (Ct.App.1985) ("The master correctly disregarded the [appraiser's] testimony on the 1.51 acre tract because it relates to a fee simple interest instead of a leasehold interest.").

award must be equitably allocated, separate and apart from its consistent contractual method of allocation argument, then Tenant should have requested the trial court to address that argument after issuance of its final order. *See Langehans v. Smith,* 347 S.C. 348, 353, 554 S.E.2d 681, 684 (Ct.App.2001) (wherein issue of equitable subrogation was not preserved for appeal since the only issue litigated before the trial court was the effect of contractual assignment).

Notwithstanding, we respectfully recognize and the dissent appropriately notes our broad scope of review in an equity proceeding. We further recognize a small portion of the leased premises was taken and have considered the appropriateness of a remand. However, even pursuant to our scope of review, we normally would not turn our attention away from appellate preservation rules. Tenant had the burden of proof and failed to meet its burden under either a legal or equitable standard of review. Utilizing our right to make factual findings pursuant to an equitable standard of review is of no avail since the record does not present evidence allowing us to find missing facts to meet even the erroneous standard of *Hamilton,* or any other standard we propose. Moreover, pursuant to an equitable standard of review, we are not bound to accept, and we specifically reject, the testimony of the expert based upon our previous discussion.

Consequently, we affirm the decision of the master-in-equity. While this conclusion may appear harsh, we are again reminded by the Lease that Tenant may still seek a separate contractual claim against Landlord for rent abatement if necessary, which in part, gives efficacy to Tenant's position that the contract is controlling over this dispute. In fact, not only does Landlord acknowledge this possibility of contractual rent abatement in its brief to the court, but also Tenant admits in its reply brief that it is not entitled to recovery for both rent reduction and loss of leasehold. Thus, we are not convinced a remand is appropriate, especially in light of Tenant's contractual agreement. Quite simply, equity would not lend itself to both an outright award of the condemnation proceeds as well as contractual rent reduction.

## CONCLUSION

We conclude Tenant is not entitled to a portion of the condemnation award based upon contractual rent abatement;

any entitlement to rent abatement would be the subject of a separate contract action. Furthermore, even if Tenant properly preserved the argument that the master-in-equity utilized an improper method of valuation or in the event we were to employ an equitable review, we nonetheless conclude the master-in-equity did not err in finding Tenant failed to meet its burden of proof.

Therefore, the decision of the master-in-equity is accordingly

**AFFIRMED AS MODIFIED.**

GOOLSBY, A.J., concurs.

HEARN, C.J., concurring in part and dissenting in part:

Respectfully, I concur in part, and dissent in part. I would reverse and hold that the long-term Tenant is entitled to the portion of the condemnation award which is supported by the only evidence adduced at trial, or, in the alternative, I would reverse and remand to allow the introduction of evidence under the correct method of valuation for a partial taking.

I agree with the majority that only Article 32(b) of the Lease's Condemnation Clause applies here, as Tenant had taken possession of the property prior to the institution of the condemnation proceeding. Additionally, the order of reference limited the scope of the Master's findings to the proper apportionment of the condemnation award; therefore, any prayer for rent abatement under the Condemnation Clause must be the subject of a separate action. I also agree the Master erred in his alternative findings that Tenant's sole remedy was to terminate the lease, and that the Condemnation Disclosure operated to exclude the condemned area from analysis under the Condemnation Clause.

However, notwithstanding the interpretation of the contractual Condemnation Clause, I find that the main purpose of this proceeding was to apportion the condemnation award, which sounds in equity, as specifically prescribed by Section 28–2–460 of the South Carolina Code (2007) ("The payment of the [condemnation] funds so awarded must be held by the clerk of court pending the final order of the court of common pleas in an equity proceeding to which all persons served with the

Condemnation Notice must be necessary parties."). *See also Gordon v. Drews*, 358 S.C. 598, 604, 595 S.E.2d 864, 867 (Ct.App.2004) ("To determine whether this suit is legal or equitable, we must look to the 'main purpose' of the action as reflected by the nature of the pleadings and proof, and the character of relief sought under them."). Accordingly, although we must apply the "any evidence" standard of review to the legal question of whether the parties' lease permitted Tenant to share in the condemnation award, once that is determined, we are free to make findings according to our own view of the preponderance of the evidence to determine how to equitably apportion the award. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 391 S.E.2d 538 (1989); *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976). The majority holds any argument that the Master failed to equitably apportion the award is not preserved for review; however, I view the standard of review not as an argument that must be raised before a trial judge in order to be preserved, but rather as the lens through which we are required to view the arguments on appeal.

Generally, a lessee, as the holder of a constitutional property interest, or as an "owner" under eminent domain statutes, is entitled to just compensation when all or part of the leasehold interest is lost by condemnation. *South Carolina State Highway Dept. v. Hammond*, 238 S.C. 317, 120 S.E.2d 21 (1961). Moreover here, the Condemnation Clause specifically provides Tenant is entitled to a portion of any condemnation award for a loss of its leasehold estate. At the time the property was partially condemned, Tenant had over seventy-three years remaining on its seventy-five year lease and presented expert testimony explaining the extent to which the condemnation diminished its interest. Conversely, Landlord presented no evidence Tenant's leasehold interest was not adversely affected, nor did it object to the method of valuation used by Tenant's expert. Despite this, the majority finds Tenant is not entitled to any portion of the condemnation award, a result the majority acknowledges "may appear harsh." Based on our standard of review, I believe this result is not only harsh, but inequitable. I would reverse and award Tenant the sum of $81, 400, the amount testified to by Tenant's expert and the only figure supported in the record.

*See Hough v. Hough,* 312 S.C. 344, 440 S.E.2d 387 (1994) (finding a party cannot complain about the valuation of an asset by a court where the party fails to present any evidence on the issue).

The majority posits, without actually adopting, a new rule in this jurisdiction for the valuation of a leasehold in the case of a partial taking. While the scholarship inherent in the majority's opinion is undeniable, this issue is not before us. No argument was advanced to the Master or before us on appeal that a different method of valuation should be applied where the take is partial. *See Langley v. Boyter,* 284 S.C. 162, 181, 325 S.E.2d 550 (Ct.App.1984) *rev'd on other grounds,* 286 S.C. 85, 332 S.E.2d 100 (1985) ("[A]ppellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked."). Moreover, while I agree with the majority's conclusion that the Master erred in the method he used to value the Tenant's interest, were I to adopt a new method of valuation, I would reverse and remand. I believe it is highly inequitable in this statutorily-mandated equity proceeding, not to afford Tenant the benefit of a remand in order to develop the record under a method of valuation which has heretofore never been recognized in South Carolina. *See Mobil Oil Corp. v. Phoenix Cent. Christian Church,* 138 Ariz. 397, 675 P.2d 284 (1983) (reversing and remanding under similar circumstances where the appellate court disagreed with the valuation method applied by the lower court in a partial condemnation proceeding).

Accordingly, I concur in part and dissent in part.